**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **MICHELLE GRANT ERVIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 04-1632 (RMC)** |
| | ) | |
| **HOWARD UNIVERSITY, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**MEMORANDUM OPINION**

When the residency program in emergency medicine at Howard University Hospital

lost its accreditation, the Hospital's Medical Director asked Dr. Michelle Grant Ervin, Chair of the

Emergency Medical Department, to resign her chairmanship. Dr. Ervin declined and was removed,

although she retained her roles as a professor in the Howard University College of Medicine and

practicing physician in the Hospital. Dr. Ervin sues both Howard University ("Howard" or "the

University") and Howard University Hospital ("the Hospital" or "HUH") alleging that Defendants:

(1) discriminated against her based on her gender; (2) created a hostile work environment based on

gender; (3) retaliated against her for opposing discrimination; (4) wrongfully discharged her from

employment in violation of public policy; and (5) breached an employment/practice agreement.[1] Her

claims for discrimination and retaliation are based upon alleged violations of Title VII of the Civil

Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e-16, and the District of Columbia

Human Rights Act, D.C. Code §§ 2-1401.01-1403.17.

Defendants move for partial summary judgment and Dr. Ervin moves for summary

---

[1] Plaintiff's claims for breach of her employment/practice agreement are not the subject of
Defendants' Motion for Summary Judgment.

judgment on Defendants' Counterclaim against her for:   (1) breach of contract; (2) unjust enrichment; (3) restitution; and (4) conversion.  *See* Dkt. ## 35 & 36.  Because there is no evidence of gender discrimination, summary judgment will be granted to Howard and HUH on Dr. Ervin's claims of gender discrimination and hostile work environment.  Summary judgment will also be granted on her claim of wrongful discharge in violation of public policy, as to which the facts are not in dispute.  Because the facts are disputed, the Court cannot decide on this record Dr. Ervin's claims of retaliation or Defendants' Counterclaim.

## I.  BACKGROUND

Howard University is a private educational institution located in the District of Columbia, of which one component is the College of Medicine.  Howard University Hospital operates a private hospital facility providing health care services in the District of Columbia.  Faculty at the College of Medicine also practice at the Hospital.  At the time of the events in question, Howard operated a residency program for physicians specializing in emergency medicine.

Dr. Michelle Grant Ervin was hired by HUH to serve as Chair of the Emergency Medicine Department ("EMD") in 1993.  Compl. ¶ 10.  Dr. Thomas Gaiter was Medical Director of the Hospital and had the final decision on Dr. Ervin's hire.  *See* Defs.' Statement of Material Facts [Dkt. # 37] ¶ 3; Defs.' Mem. in Supp. of Mot. for Summ. J. ("Defs.' Mem.") [Dkt. # 35], Exs. 1-2.  Nonetheless, as described below, after 1995 they developed a difficult relationship and Dr. Ervin came to refuse to meet personally with Dr. Gaiter unless someone else was present.  Pl.'s Statement of Material Facts [Dkt. # 42] ¶ 11.

As Chair of the EMD, Dr. Ervin was the program director of the EMD residency program. Defs.' Statement of Material Facts ¶¶ 16-17.  She supervised approximately nine full-time

faculty and two part-time faculty in addition to the residents in the program while also performing clinical (patient care) duties.  Pl.'s Statement of Material Facts ¶ 3.

At some time in late 1995, Dr. Ervin maintained and refused to back down on her belief that Dr. Wayne Moore, an attending physician in the EMD, should not be paid a full-time salary if he were unwilling to work shifts because he also served as the full-time Director of the D.C. Fire and Emergency Services.  Id. ¶ 5.  Dr. Moore began serving as Director of the D.C. Fire and Emergency Services in December 1995; in February 1996, Dr. Ervin wrote him a stinging letter, demanding that he return excess salary that had been paid to him.  Pl.'s Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n") [Dkt. # 42], Ex. 3.  She asserts that Dr. Gaiter refused to support her in this instance and, due to favoritism,[2] allowed Dr. Moore to avoid working shifts.  It is this episode from which she traces the difficulties in her relationship with Dr. Gaiter.  Pl.'s Opp'n at 4.

In late 1995 or early 1996, Dr. Gaiter asked Dr. Michael Washington, Clinical Director of the EMD, to obtain input from the EMD faculty concerning Dr. Ervin's performance. Compl. ¶ 17.  Dr. Washington convened a meeting for that purpose, which Dr. Gaiter did not attend. Defs.' Statement of Material Facts ¶ 4.  After some discussion, the faculty voted, seven to three, to support the retention of Dr. Ervin as chair of the EMD.

> There was unanimous praise for the outstanding job Dr. Ervin has done in leading the effort that resulted in accreditation for the residency program. This was felt to be a monumental task and the importance of this achievement should not be understated. . . . There were two major areas of concern that the faculty noted.
>
> I.  Interactions with faculty, other departments.

_____

[2]  This favoritism, according to Dr. Ervin, stems from Dr. Gaiter and Dr. Moore attending the same medical school and possibly the same church.  See Pl.'s Opp'n at 4 n.3.

On several occasions Dr. Ervin has created unnecessary hostile interactions with emergency medicine faculty.  Faculty members are, at times, not treated with respect, as valued colleagues.  Personality conflicts, especially those with Dr. Hambrick and Dr. Moore, should not play a role in department business.  This point was felt to be of the utmost importance.

If one held a view opposite that of the Chair, then they were put down and castigated in open meeting [sic].  This behavior only serves to alienate faculty and, in some cases, contributed to their decision to leave the department.

II. Decision-making in the Department.

Too often departmental decisions are made unilaterally by the chair.  In addition, decisions made by the chair have been presented to Administration as faculty decisions without our approval. . . .

Pl.'s Opp'n, Ex. 4.  Dr. Ervin sees this episode as an effort on the part of Dr. Gaiter to obtain a vote of "no confidence" and remove her as Chair of the EMD.  *See* Compl. ¶ 18.

On October 19, 2001, Dr. Ervin sent Dr. Gaiter a memorandum complaining about the unprofessionalism of Dr. Press, then Chair of the Radiology Department.  *Id.* ¶¶ 20-21.  Dr. Ervin wrote:

On October 19, 2001 at 1645 [4:45 pm], my associate residency director, Dr. Cherie Terry was in Radiology trying to obtain X-ray readings on ED patients so that dispositions could be made and keep the ED open.  After identifying the films, Dr. Terry was using this as a teaching opportunity with 2 medical students (out of State) and 4 residents.  Dr. Press verbally abused Dr. Terry, cursed her using foul language and closed the door in the reading room in her face.  All of this took place in front of the medical team.  I am demanding an immediate apology from this individual, dismissal from the medical faculty and disciplinary action from the Medical-Dental Staff for harassment and denigration of a female faculty member.  Nothing less will suffice.

Pl.'s Opp'n, Ex. 7.  Dr. Gaiter merely responded that an investigation would take place.  Pl.'s Statement of Material Facts ¶ 16.  That was the end of the matter, and Dr. Terry was not disciplined.

*Id*. ¶¶ 17-18.

In 2002, Dr. Ervin hired three new faculty for the EMD.  Compl. ¶ 27.  Dr. Gaiter did not timely sign the paperwork necessary to process their first salary checks.  *Id*. ¶ 28.  The Hospital attributes his slow response to the failure of the three new doctors to submit necessary forms.  *See* Defs.' Mem. at 12.  In any event, Dr. Ervin contacted the Hospital's Chief Executive Officer, Sherman McCoy, and asked for his help.  Compl. ¶ 30.  Mr. McCoy directed Dr. Gaiter to sign the checks.  *Id*. ¶ 31.  Dr. Ervin was embarrassed by the incident, as one of the new doctors almost faced foreclosure and threatened to quit.  Pl.'s Opp'n at 6.

At times during her chairmanship at HUH, Dr. Ervin was required to justify and present the EMD budget at Chair meetings.  Defs.' Statement of Material Facts ¶¶ 6-7; Defs.' Mem., Ex. 4.  Although Dr. Ervin favored these broad-based presentations, *see* Defs.' Mem., Ex. 4, she contends that she was required to present publicly because of her gender.  Pl.'s Opp'n at 17.

As Chair of the EMD, Dr. Ervin pushed hard to get resources she needed.  In February 2003, Dr. Ervin gave a PowerPoint presentation to the Board of Trustees Medical Affairs Committee concerning patient safety and health issues affecting the EMD.  Compl. ¶ 36.  That presentation prompted Marie C. Johns, a member of the Board of Trustees and the Medical Affairs Committee of the Board, to visit the EMD in April 2003.  *Id*. ¶ 37.  During this visit, Dr. Ervin raised her concerns about the "speed or efficiency with which patients moved from the emergency department to inpatient status."  Pl.'s Statement of Material Facts ¶ 36.  Dr. Ervin also mentioned her concerns about the location of radiology equipment, at some distance from the EMD.  *Id*. ¶ 38.  After this

visit, Ms. Johns discussed these issues with Mr. Payson, Chair of the Board Committee.[3]  *Id.* ¶ 39.

In April 2002, the Accreditation Council for Graduate Medical Education (the "ACGME") sent a notice to HUH stating that accreditation of the EMD residency program was being withdrawn, to be effective on June 30, 2003.  *See* Pl.'s Statement of Material Facts ¶¶ 54-57.  That letter identified eight deficiencies in the HUH EMD residency program, three of which were specifically noted as the program director's responsibility.  Pl.'s Opp'n, Ex. 13.[4]  On June 13, 2003, Dr. Ervin was asked to resign as Chair of the EMD but she refused.  Defs.' Mem., Ex. 4.  She was notified in writing of her removal as Chair on that same date.  *Id.*, Ex. 7.  The letter from Dr. Gaiter stated:

> I wish to thank you for your years of service as the Department Chair and Director of Emergency Medicine at Howard University Hospital.
>
> The Department of Emergency Medicine is an important entity within this organization and has many challenges.  After careful consideration, it has been determined that a change in leadership is warranted within the department effective this day, June 13, 2003.
>
> Once again, thank you for your years of service to this organization as the Director of Emergency Medicine.  We look forward to you continuing as an attending physician within the Department of Emergency Medicine.

*Id.*

In mid-July 2003, Dr. Ervin wrote to Dr. Washington, who was then Interim Director

---

[3]  Both of these issues were continuing trouble spots for the EMD.  Without ready access to X-ray results, the EMD could not diagnose emergency patients and expeditiously move them out of the emergency room and into the Hospital.  *See* Pl.'s Statement of Material Facts ¶ 37.

[4]  HUH filed an appeal with the ACGME and received a letter dated February 12, 2003, that sustained eight citations against the residency program and declared that its accreditation was withdrawn, effective June 2004.  The additional time period was to allow doctors in the EMD residency program to re-locate.  *See* Pl.'s Opp'n, Ex. 14.

of the EMD, and requested a lengthy period of leave without pay until the following June 2004. *Id.*, Ex. 4. The record reveals no specific response to this request. Strangely, even though she was in theory on an unpaid leave of absence, Dr. Ervin wrote a second time to Dr. Washington on August 11, 2003. This letter sought "leave from my clinical duties effective August 11, 2003," although Dr. Ervin "remain[ed] willing to fulfill other activities as an Emergency Medicine physician in the department and faculty member of the College of Medicine." *Id.*, Ex. 8. According to Defendants, Dr. Ervin continued to work, and be paid, until December 2003.[5] Defs.' Statement of Material Facts ¶ 23.

At times while Dr. Ervin worked at HUH, the Chair of the Department of Radiology was Dr. James S. Teal. *Id.* ¶ 24. During the course of Dr. Teal's tenure as Chair, the Radiology Department had an accredited residency program. *Id.* ¶ 25. However, on or about October 29, 2003, the ACGME sent notice to HUH that the accreditation for the Department of Radiology residency program was being proposed for withdrawal. *Id.* ¶ 26. At a date prior to November 6, 2003, Dr. Teal was asked to resign as Chair of the Department of Radiology, which he did, in writing, on November 6, 2003. *Id.* ¶¶ 27-28. Dr. Roma V. Gumbs, a female physician, replaced Dr. Teal as Chair of the Department. *Id.* ¶ 29. In late June 2005, ACGME withdrew accreditation for the radiology residency program. *Id.* ¶ 30.

On July 19, 2003, counsel for Dr. Ervin wrote to the University and HUH and informed them that Dr. Ervin intended to challenge her removal as Chair of the EMD on the basis

---

[5] The parties dispute whether Dr. Ervin was properly paid for this time, and whether she or Howard violated her employment agreement. These matters cannot be decided on the present record. Accordingly, Plaintiff's Motion for Summary Judgment as it Relates to the University's Counterclaim Against Plaintiff [Dkt. # 36] will be denied.

that it was caused, in part, by unlawful gender-based discrimination.  *See* Pl.'s Statement of Material Facts ¶ 88.  Dr. Ervin filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") on April 6, 2004.  Def.'s Mem., Ex. 13.  Her charge asserted that she had been "subjected to blatant gender bias" while Chair of the EMD at the Hospital; that Dr. Gaiter's actions against her began when Dr. Ervin opposed a special staffing arrangement for Dr. Moore; that, as a consequence, Dr. Gaiter attempted to obtain a "no confidence" vote from the EMD faculty against Dr. Ervin; that the 2002 review of the EMD was handled differently than the reviews of the Radiology, Internal Medicine, and Surgery Departments; that Dr. Gaiter thwarted Dr. Ervin's efforts to hire needed faculty within the EMD; and that Dr. Ervin spoke out about the crisis in patient care in the EMD in the Spring of 2003 and was, accordingly, asked to resign as Chair.  Dr. Ervin also charged that she had suffered from a hostile work environment and had been retaliated against for filing charges in that HUH had stopped paying her properly.  The EEOC dismissed the charge and issued a Notice of Right to Sue on June 25, 2004.  *Id.*, Ex. 14.  This lawsuit followed.

The Complaint is comprised of eight counts.  Dr. Ervin alleges that she has been discriminated against based on her gender, *see* Compl. ¶¶ 62-70, 85-84 (Counts I and IV), subjected to a hostile work environment, *see id.* ¶¶ 71-76, 102-09 (Counts II and V), retaliated against for her opposition to discrimination, *see id.* ¶¶ 77-84, 102-09 (Counts III and VI), and wrongfully discharged in violation of the public policy of the District of Columbia, *see id.* ¶¶ 110-18 (Count VII).  In Count VIII of her Complaint, Dr. Ervin alleges that Defendants breached the Member Practice Agreement that addressed both the type of professional and academic services she was to provide to Defendants, as well as Dr. Ervin's compensation for providing professional and academic services.  *See id.* ¶¶ 119-126.  Defendants move for summary judgment on Counts I-VII, not on Count VIII.

## II.  LEGAL STANDARDS

**A.**  **Federal Rule of Civil Procedure 56**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment will be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). Moreover, summary judgment is properly granted against a party that "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson*, 477 U.S. at 248. A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. By pointing to the

-9-

absence of evidence proffered by the nonmoving party, a moving party may succeed on summary

judgment.  *Id.*  In addition, the nonmoving party may not rely solely on allegations or conclusory

statements.  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154

(D.C. Cir. 1993).   Rather, the nonmoving party must present specific facts that would enable a

reasonable jury to find in its favor.  *Greene*, 164 F.3d at 675.  If the evidence "is merely colorable,

or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50

(citations omitted).

>   **B.**      **Title VII**

>   In order to prevail on a claim of discrimination under Title VII, a plaintiff must

establish the following:

>> First, the plaintiff has the burden of proving by the preponderance of
>> the evidence a prima facie case of discrimination.  Second, if the
>> plaintiff succeeds in proving the prima facie case, the burden shifts to
>> the defendant "to articulate some legitimate, nondiscriminatory
>> reason for the employee's rejection."  Third, should the defendant
>> carry this burden, the plaintiff must then have the opportunity to
>> prove by a preponderance of the evidence that the legitimate reasons
>> offered by the defendant were not its true reasons, but were a pretext
>> for discrimination . . . . The ultimate burden of persuading the trier of
>> fact that the defendant intentionally discriminated against the plaintiff
>> remains at all times with the plaintiff.

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (internal citations omitted)

(quoting *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973)).

>   If the employer successfully presents a legitimate, non-discriminatory reason for its

actions, "the *McDonnell Douglas* framework – with its presumptions and burdens – disappears, and

the sole remaining issue [is] discrimination *vel non*."  *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C.

Cir. 2003); *see also Brady v. Office of the Sergeant at Arms, U.S. House of Representatives*, 520 F.3d

490, 494 (D.C. Cir. 2008) (noting that "the prima facie case is a largely unnecessary sideshow").[6]

"The district court need resolve only one question: 'Has the employee produced sufficient evidence

for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the

actual reason and that the employer intentionally discriminated against the employee on the basis of

race, color, religion, sex, or national origin?" *See Short v. Chertoff*, No. 05-1034, 2008 U.S. Dist.

LEXIS 41240, at *11 (D.D.C. May 27, 2008) (quoting *Brady*, 520 F.3d at 494).

## C.     D.C. Human Rights Act

The D.C. Human Rights Act ("DCHRA") prohibits employers from discharging or

otherwise discriminating against an individual with respect to the terms and conditions of

employment based on the individual's membership in a protected category. *See* D.C. Code § 2-

---

[6] In *Brady*, the D.C. Circuit considered whether a district court must consider whether a plaintiff made out a *prima facie* case of discrimination.

> In a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not – *and should not* – decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*. Rather, in considering an employer's motion for summary judgment . . . the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?

*Id*. at 494 (emphasis in original). "We emphasize that question whether the plaintiff in a disparate-treatment discrimination suit actually made out a prima facie case is almost always irrelevant when the district court considers an employer's motion for summary judgment or judgment as a matter of law." *Id*. at 492 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 514-15 (1993); *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)).

1402.22(a)(1).  "[T]he intent of the Council of the District of Columbia . . . [is] to secure an end . . . to discrimination for any reason other than that of individual merit, including, but not limited to, discrimination by reason of race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression . . . ."  *Id.* § 2-1401.01.  Dr. Ervin's Complaint alleges both discrimination and retaliation in violation of the DCHRA.  In analyzing a claim of employment discrimination under the DCHRA, courts look to Title VII and its jurisprudence.  *Goos v. Nat'l Ass'n of Realtors*, 715 F. Supp. 2, 3 (D.D.C. 1989).[7]

### III.  ANALYSIS

**A.  Gender Discrimination (Counts I and IV)**

Dr. Ervin alleges that Defendants subjected her to gender discrimination in two ways. First, she alleges that Defendants subjected her to a disparate application of HUH policies and practices.  *See* Compl. ¶¶ 67 & 91.  Second, Dr. Ervin alleges that her gender was the reason why she was removed from her position as Chair of the EMD.  *Id.*

1.    Disparate Application of HUH Policies and Practices

Dr. Ervin alleges that Defendants subjected her to disparate application of their policies and practices.  This claim is based on two facts:  Dr. Ervin had to present publicly plans for improvement in the EMD and Dr. Ervin was not offered the opportunity to step down as Chair of the EMD.  *See* Pl.'s Opp'n at 17.  Upon examination, neither asserted "fact" supports the desired conclusion.

---

[7] *See also* Defs.' Mem. at 14 n.4 ("Because the legal standards governing the analysis of claims under Title VII and the D.C. Human Rights Act are the same, Plaintiff's claims under Count I and IV, II and V, and III and VI are treated accordingly for purposes of this Motion.") (citations omitted).

i.      *Public Presentations*

Dr. Ervin complains that her department was the only critical service area required to present its performance improvement plan in an open, hospital-wide forum, whereas "Dr. Gaiter allowed other critical service areas to present their full performance improvement plans in private meetings with him." *Id.* However, Dr. Ervin testified at her deposition that she favored presenting her recommendations to as many departments or people as could be gathered and that requiring the departments to make presentations on a broad scale was in the best interests of HUH. *See* Def.'s Mem., Ex. 4. Moreover, Dr. Ervin refused to meet privately with Dr. Gaiter, *see* Pl.'s Statement of Material Facts ¶ 11, so an invitation to do so would have been declined. Dr. Ervin does not know whether the two other departments whose chairs were women were required to present publicly. *See* Def.'s Mem., Ex. 4. Finally, Dr. Ervin agrees that she should have had to justify her recommendations for the EMD to Dr. Gaiter, *see id.*, and some of her performance recommendations were implemented. *Id.* These concessions destroy the argument that disparate treatment, due to Dr. Ervin's gender, was behind having Dr. Ervin publicly present her performance improvement plan for the EMD.

ii.      *Offer of Resignation*

Dr. Ervin also complains that she was not offered the opportunity to step down as Chair of the EMD. *See* Pl.'s Opp'n at 17 ("As a woman, Dr. Ervin was not afforded the courtesy of being allowed to resign as Chair of the EMD.") This allegation in counsel's brief contradicts the facts alleged in the complaint. In fact, she *was* offered the opportunity to resign *and refused*. *See* Compl. ¶¶ 41-42 ("Gaiter asked Dr. Ervin to step down as EMD Chair. Dr. Ervin refused to do so. By letter dated June 16, 2003, Gaiter advised Dr. Ervin that he wanted a 'change in leadership'

within the EMD.  And that as a result, Dr. Ervin was being relieved of her duties as Chair of the EMD.").[8]  Only in the face of her refusal did she receive a letter from Dr. Gaiter, telling her that the Department needed new leadership.  Dr. James Teal, to whom Dr. Ervin would compare herself, is in this respect not comparable.  Although Dr. Teal, just as Dr. Ervin, was asked to resign his Chair when the radiology residency program lost accreditation, he immediately agreed and wrote a letter of gracious resignation.  *See* Defs.' Mem., Ex. 2.

2.    Removal as Chair of EMD

Dr. Ervin is a woman; she had a fractious relationship with Dr. Gaiter, a male; and she was relieved of her duties as Chair of the Emergency Medicine Department after the EMD residency program lost its accreditation.  In actuality, this is the totality of her evidence that her removal as Chair was due to gender discrimination.  For instance, from Dr. Ervin's deposition, one learns that Dr. Gaiter never lost his temper with her; never called her any names; never made disparaging remarks about or to her; never told any sexually-charged jokes in her presence and, as far as she knew, never told any sex-based or gender-biased joke in front of others; never used profanity; never made any sexual advances to her or propositioned her; never threatened Dr. Ervin with any physical harm and never caused her any physical harm; and she has never seen Dr. Gaiter do any of the foregoing things to anyone else.  *See generally* Defs.' Mem., Ex. 4.  Other than Dr. Ervin's own gender, there is a dearth of evidence of gender discrimination.

The Hospital presents a legitimate non-discriminatory reason for its decision to

---

[8]  The portion of Dr. Ervin's deposition transcript presented by the Defendants, *see* Defs.' Mem., Ex. 4 at 151:20-155:21, suggests that Dr. Gaiter told Dr. Ervin that he was removing her as Chair at the meeting on June 13, 2003.  While that may be accurate, it is incomplete.  Dr. Gaiter's statement of removal came only after Dr. Ervin refused his offer to have her resign, as the Complaint itself makes clear.

remove Dr. Ervin as Chair of the EMD: it desired a change in leadership.  Dr. Ervin had been Chair

of the EMD for years and had failed to preserve the residency program.  Although, undoubtedly, the

shaky accreditation status of HUH also imperiled the EMD residency program in addition to the

flaws identified by the AGCME, the Court can find no evidence of gender discrimination behind Dr.

Gaiter's decisions to remove department Chairs, such as Drs. Ervin and Teal, whose departments

lost AGCME accreditation for their residency programs.  In Dr. Ervin's case, specific failings of the

EMD residency program were attributed directly to her leadership as program director.  *See* Pl.'s

Opp'n, Ex. 13.

Dr. Ervin attempts to shore up her direct claim of discrimination by pointing to

alleged incidents of a gender-based hostile work environment but these far-removed incidents,

individually and collectively, lend no support to her claim of gender discrimination in her removal

from the position of Chair.  She further argues that Defendants' reason for her removal must be a

pretext for discrimination because no one ever presented her with any documentation that she had

deficiencies in her management style and, in fact, far more persons than not, who were interviewed

by the Equal Employment Opportunity ("EEO") investigator after she filed charges, praised Dr.

Ervin's work.  *Id*. at 20.  She also contends that she was used as a scapegoat when ACGME

withdrew the EMD residency accreditation because the program could not be accredited as long as

HUH itself had an unfavorable accreditation status.  *Id*. at 20-21.  She claims that there are disputed

issues of material fact as to "Defendants' motivation in 1) waiting over 15 months, between April

10, 2002, and June 13, 2002, to remove Dr. Ervin upon notice of the loss of accreditation, and 2)

removing Dr. Ervin one full year prior to the effective date of the loss of accreditation," which

ACGME had extended, in February 2003, to June 2004.  *Id*. at 21.

Dr. Ervin's arguments represent just that: arguments. She disputes any perceived deficiencies in her management style but the record reflects disquiet in the EMD long before June 2003 because of her style; such perceptions do nothing to diminish Dr. Ervin's medical skills since management and medicine are not the same. Whether HUH used Dr. Ervin as a "scapegoat" is irrelevant; even if it did, which is arguable since she had been Chair of the EMD for so long, such a fact would not support a claim of gender discrimination, especially since Dr. Teal was subject to the same fate when radiology lost the accreditation for its residency program. Finally, the allegedly strange timing of the request for her resignation may have some bearing on her claim for discharge in breach of public policy, *see infra*, but does not speak to her gender claims. Where an employer proffers a legitimate nondiscriminatory reason for an adverse action, a plaintiff must show pretext and "demonstrate that the proffered reason was not the true reason for the employment decision." *Texas Dep't of Cmty. Affairs*, 450 U.S. at 256. Dr. Ervin has failed to make a showing of pretext sufficient to raise a genuine issue of material fact. Summary judgment will be granted to Defendants on her claims of gender discrimination (Counts I and IV).

**B.      Hostile Work Environment (Counts II and V)**

A hostile work environment is "comprised of a series of separate acts that collectively constitute one unlawful employment practice." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (internal quotation marks omitted). "The workplace becomes 'hostile' for purposes of a Title VII claim only when it is 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *See Brantley v. Kempthorne*, No. 06-1137, 2008 U.S. Dist. LEXIS 38406, at *23-24 (D.D.C. May 13, 2008) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17,

21-22 (1993)).  A plaintiff is not required to plead a *prima facie* case of hostile work environment in the complaint; however, the alleged facts must support such a claim.  *Brantley*, 2008 U.S. Dist. LEXIS 38406, at *24.

In support for her claims for hostile work environment, Dr. Ervin describes the following incidents:  First, in 1995, Dr. Gaiter convened a meeting allegedly to obtain a "no confidence" vote regarding Plaintiff.  *See* Compl. ¶ 17.  Second, in 2001, Dr. Gaiter did not take action when Plaintiff wrote a memo regarding alleged unprofessionalism by a male physician towards a female physician.  *Id*. ¶¶ 20-21.  Third, in 2002 and 2003, Dr. Ervin was required to publicly present performance review documents concerning the EMD.  *Id*. ¶ 25.  Finally, in 2002, the paperwork necessary to process salary payments to three EMD physicians was delayed.  *Id*. ¶¶ 27-33.

Before suing under Title VII, a party must exhaust administrative remedies by filing a charge of discrimination with the EEOC "within one hundred and eighty days after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1).  Where cross-filing of a complaint occurs by virtue of a work-sharing agreement between the EEOC and a State or local agency, "such charge shall be filed . . . within three hundred days after the alleged unlawful employment practice occurred."  *Id*.  Here, it appears that Plaintiff's Charge of Discrimination was cross-filed with the EEOC on or about April 6, 2004, which was within 300 days of her removal as Chair of the EMD.  The Complaint was filed in this case on September 23, 2004.

Defendants contend that all of the events that relate to Plaintiff's hostile work environment claim pre-date June 11, 2003, which is 300 days prior to April 6, 2004, and therefore are time-barred.  *See* Defs.' Mem. at 16-17.  Plaintiff contends that, under the "continuing violations

doctrine," "if the alleged acts constitute one similar pattern or practice and at least one illegal act took place within the filing period, then the complaint of discrimination is not time-barred and acts outside the statutory period may be considered for purposes of liability."  *See* Pl.'s Opp'n at 24 (citing *Singletary v. District of Columbia*, 351 F.3d 519, 526 (D.C. Cir. 2003)).  Here, she contends, the alleged incidents "are part of a continuing pattern over the years, which pattern is cognizable under the continuing violation doctrine."  *See* Pl.'s Opp'n at 24-25.

   The Court disagrees.  The discrete incidents of alleged discrimination raised by Dr. Ervin are separated by several years in some instances and have no relation to each other.  *See Nat'l R.R. Passenger Corp.*, 536 U.S. at 112 ("[D]iscrete acts that fall within the statutory time period do not make timely acts that fall outside the time period."); *see also Foster v. Nat'l R.R. Passenger Corp.*, 610 F. Supp. 881, 884-85 (D.D.C. 1985) (finding no continuing violation where "the plaintiff has completely failed to allege that there is any connection between the original incident of alleged discrimination and more recent occurrences").  Even if Plaintiff's claims were not time-barred, the isolated incidents of which she complains are insufficient to sustain an action for hostile work environment.  The totality of the incidents she alleges do not establish a pattern of "severe or pervasive" conduct that altered the conditions of her work environment.  *See Brantley*, 2008 U.S. Dist. LEXIS 38406, at *29-30 (citing *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81 (1998)); *George v. Leavitt*, 407 F.3d 405, 416-17 (D.C. Cir. 2005); *Taylor v. Chao*, 516 F. Supp. 2d 128, 137 (D.D.C. 2007); *Singh v. U.S. House of Representatives*, 300 F. Supp. 2d 48, 54-57 (D.D.C. 2004). Nor do the incidents suggest discrimination based on gender.  *See Stewart v. Evans*, 275 F.3d 1126, 1133 (D.C. Cir. 2002) ("Title VII does not prohibit all forms of workplace harassment, only those directed at discrimination because of sex.").  In sum, the events described by Dr. Ervin do not show

a gender-hostile environment and cannot be found to have unreasonably interfered with Dr. Ervin's work performance. *See id*. at 1133-34. Summary judgment will be granted to Defendants on Counts II and V of the Complaint.

### C.    Retaliation (Counts III and VI)

Title VII prohibits an employer from retaliating against an employee because she "has opposed any practice made an unlawful employment practice by this title, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title." *See* 42 U.S.C. § 2000e-3(a).  To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that: (1) she engaged in a statutorily protected activity; (2) defendants took an adverse employment action; and (3) there is a causal relationship between the two. *See Stewart*, 275 F.3d at 1134; *Clipper v. Billington*, 414 F. Supp. 2d 16, 25 (D.D.C. 2006).  A showing of "adverse employment action" requires "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Patterson v. Johnson*, 505 F.3d 1296, 1298 (D.C. Cir. 2007) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).  To show that the act taken by the employer was adverse, a plaintiff must demonstrate that the action was one that a reasonable employee would have found to be "materially adverse," which in the context of a retaliation claim means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Patterson*, 505 F.3d at 1299.  The causal connection may be established by showing that the official responsible for the alleged retaliatory act had knowledge of the protected activity and took the adverse action shortly thereafter. *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985).  Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to

articulate some legitimate nondiscriminatory reason for its action.  *Patterson*, 505 F.3d at 1299. If the defendant meets this burden, then the plaintiff must have the opportunity to prove, by a preponderance of the evidence, that the legitimate reason offered by the employer was not its true reason, and was in fact retaliatory.  *Id*. at 1300-01.

Dr. Ervin alleges that after she complained internally and to the EEO about her June 2003 removal as Chair of the EMD, Defendants retaliated against her. Specifically, she alleges that Defendants retaliated by: (1) allowing her malpractice coverage to lapse; (2) stopping her pay for six weeks; (3) restarting her pay at a reduced rate; (4) failing to pay her for an approved vacation in July and August 2003; (5) failing to pay her for approved grant stipend work completed between October 1, 2002 and September 2003; and (6) ending medical insurance coverage for her and her minor daughter without notice and without advising her of her entitlement to elect continued insurance coverage under COBRA.  *See* Pl.'s Opp'n at 29.

Defendants contend that Dr. Ervin "has not presented any evidence to suggest that any lapse in her malpractice coverage had any adverse consequence to her or that any such lapse was based on any alleged protected conduct."  *See* Defs.' Reply in Supp. of Mot. for Summ. J. ("Defs.' Reply") [Dkt. # 45] at 17.  On the second, third, fourth, and sixth claims for retaliation, Defendants argue that "Plaintiff was required under her Member Practice Agreement ("MPA") with Defendants to perform professional services.  However, it is undisputed that Plaintiff did not perform any clinical services (or "Professional Services" as defined in the MPA) after she was removed as Chair of the EMD . . . . Plaintiff has failed to establish that Defendants' failure to pay Plaintiff was causally related to her Complaint of discrimination."  *Id*.  On Plaintiff's fifth claim, Defendants state that Plaintiff has produced no evidence that Defendants ever received such grants or grant funding.  *Id*.

After careful review of the briefs and exhibits submitted by the parties, and after drawing all inferences in Plaintiff's favor, the Court concludes that Dr. Ervin's retaliation claims cannot be decided on the present record. The Court will deny Defendants' motion for summary judgment on the claims of retaliation (Counts III and VI).

**D.     Wrongful Discharge in Violation of Public Policy (Count VII)**

In general, under D.C. law, "an employer may discharge an at-will employee at any time and for any reason, or for no reason at all." *See Davis v. Gables Residential/H.G.Smithy*, 525 F. Supp. 2d 87, 102 (D.D.C. 2007) (citations omitted). The District of Columbia recognizes an intentional tort for wrongful discharge based up on a "very narrow" public policy exception to the employment-at-will doctrine. *See Fingerhut v. Children's Nat'l Med. Ctr.*, 738 A.2d 799, 803 (D.C. 1999). This public policy exception was first established in *Adams v. George W. Cochran & Co.*, 597 A.2d 28 (D.C. 1991). In *Adams*, the plaintiff alleged that he was terminated from employment for refusing to drive a truck that lacked a required inspection sticker. 597 A.2d at 29. Specifically, the plaintiff alleged that his employer directed him to break the law and then terminated him when he refused to do so. *Id*. at 29-30. In its holding, the court ruled that an employee may bring a cause of action against his or her former employer for wrongful discharge "when the sole reason for the discharge is the employee's refusal to violate the law, as expressed in a statute or municipal regulation." *Id*. at 34.

In 1997, the D.C. Court of Appeals expanded the *Adams* public policy exception. *See Carl v. Children's Hosp.*, 702 A.2d 159 (D.C. 1997) (en banc). In *Carl*, the plaintiff, a part-time nurse, alleged that she was terminated because she advocated for patients' rights and against her employer's interests before D.C. Council and in court as an expert witness in medical malpractice

cases. *Id*. at 160.  She premised her claim on D.C. Code § 1-224 (making it a crime to injure any

witness in her person or property on account of testifying before City Council).  She did not claim

that her former employer had violated D.C. Code § 1-224 or that the statute created a private right

of action, but that her termination was actionable as a public policy exception to the at-will doctrine.

*Id*. at 159.  The court held that *Adams* did "not foreclose any additional 'public policy' exceptions

to the general rule that employment contracts are always at will unless they expressly provide

otherwise," and that the complaint survived a motion to dismiss because it fell within public policy

"solidly based" on, or "firmly anchored" in, D.C. Code § 1-224.  *Id*. at 160, 163-64.

> Future requests to recognize such exceptions, therefore, should be
> addressed only on a case-by case basis.  This court should consider
> seriously only those arguments that reflect a clear mandate of public
> policy – *i.e.*, those that make a clear showing, based on some
> identifiable policy that has been "officially declared" in a statute or
> municipal regulation, or in the Constitution, that a new exception is
> needed.  Furthermore, there must be a close fit between the policy
> thus declared and the conduct at issue in the allegedly wrongful
> termination.

*Id*. at 164 (footnotes omitted) (Terry, J., concurring).

It is undisputed that Dr. Ervin was an at-will employee.  Dr. Ervin alleges that she

was wrongfully removed as Chair of the EMD in violation of District of Columbia public policy, as

a direct and proximate result of her complaints about health and safety violations at HUH.  *See*

Compl. ¶¶ 110-18 (citing D.C. Code § 3-1205.14(25) and (26) (outlining circumstances under which

a health care professional's license may be revoked)).  In her Opposition to Defendants' Motion for

Summary Judgment, Dr. Ervin also cites D.C. Municipal Regulations in support of her wrongful

discharge claim.  *See* Pl.'s Opp'n at 33-34 (citing 17 DCMR § 4612.7 (providing that "a licensed

physician shall not willfully or carelessly disregard the health, welfare, or safety of a patient"); *id*.

§ 4612.8 (providing that "a licensed physician shall conform to the prevailing standards of acceptable medical practice"); *id*. § 4008.1 (providing that "a health professional shall not make or cause to be made a false or misleading communication about the health professional or health professional's services")).

There is no evidence here that Dr. Ervin was required to choose between risking criminal liability and losing her job. The court in *Carl* rejected using broad, professional conduct standards such as the D.C. Code's statute on the conduct of health care professionals as a basis for the public policy exception to the at-will doctrine. *See Carl*, 702 A.2d at 164-65. The D.C. Municipal Regulations do no better to support Plaintiff's claim because they do not address "rights officially recognized," such as the right to testify without suffering harm. Dr. Ervin has not established that her removal as Chair of the EMD was, as a matter of law, "wrongful discharge," and she has not identified a statute or regulation that mandated she report her complaints. *See Wallace v. Skadden Arps, Slate, Meagher & Flom*, 715 A.2d 873, 884 (D.C. 1998).[9] Finally, Dr. Ervin fails to set forth any causal nexus between her alleged refusal to violate the law and her discharge. Summary judgment will be granted to Defendants on Count VII.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Motion for Partial Summary Judgment [Dkt.

---

[9] In *Wallace*, the plaintiff complained that she was discharged from an associate attorney position because she raised concerns about the activities of other attorneys in her law firm based upon her perceived responsibilities under the Rules of Professional Conduct. The court noted that the Rules of Professional Conduct did not include any requirement or duty to report any wrongdoing. *Id*. at 883. The court held that, because the plaintiff could not show that she had a legal obligation to report to her superiors the improper conduct which she claims to have observed, her complaint could not be sustained under *Adams*. *Id*. at 884.

# 35] will be granted in part and denied in part[10] and Plaintiff's Motion for Summary Judgment [Dkt.

# 42] will be denied.  A memorializing order accompanies this Memorandum Opinion.


Date: June 24, 2008                              _____/s/_____
                                                 ROSEMARY M. COLLYER
                                                 United States District Judge

---

[10] Counts III (retaliation); VI (retaliation); and VIII (breach of contract/Member Practice Agreement) of the Complaint remain at issue.  All Counts of Defendants' Counterclaim remain at issue.